2023 IL App (1st) 182121-U

No. 1-18-2121

Order filed September 22, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 6771 |
| | ) | |
| FRANK SMITH, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: The summary dismissal of defendant's *pro se* postconviction petition is affirmed where his claims were waived by his guilty plea and the exception to waiver for postconviction claims of actual innocence does not apply.

¶ 2    Defendant Frank Smith, who pled guilty to one count each of first degree murder and attempted first degree murder in exchange for consecutive terms of 38 and 8 years' imprisonment, respectively, appeals from the first-stage summary dismissal of his *pro se* petition for relief filed pursuant to the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2018). On

appeal, defendant contends that summary dismissal was erroneous where (1) the trial court violated his sixth amendment right to self-representation when it denied his request to represent himself at trial; and (2) his trial counsel was ineffective for failing to subpoena key witnesses who would have proved his actions were justified. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      Defendant's convictions arose from a shooting that occurred on February 28, 2014, during which he injured Jessica Payne and killed her mother, Theresa Spearman. Following his arrest, defendant was charged by indictment with 33 counts of first degree murder, 4 counts of attempted first degree murder, and 3 counts of aggravated battery. In his answer to the State's motion for pretrial discovery, defendant, among other things, asserted self-defense and provocation.

¶ 5      On November 14, 2014, defense counsel requested that the trial court order a behavioral clinical examination (BCX) of defendant for fitness to stand trial, fitness with medication, and sanity at the time of the offense. A psychiatrist examined defendant on December 4, 2014, and concluded he was fit to stand trial with or without medication. Another psychiatrist examined him on April 17, 2015, and concluded he was legally sane at the time of the offense.

¶ 6      On May 20, 2015, defense counsel informed the court that the case was "up for motion to reduce bond and to pick a trial date," but, also, that defendant had indicated he wanted to represent himself. Defendant confirmed to the court that this was his wish. The trial court stated it would review defendant's file and consider his request.

¶ 7      When the case was next called, on May 27, 2015, the trial court confirmed with the attorneys that discovery was complete. Defense counsel indicated there was "nothing left to be

done except addressing the defendant's request to go *pro se*." The State agreed the case had been ready for trial "for a while."

¶ 8     Defendant told the court that the case was not ready to go to trial because "[m]y witnesses got to be filed." He opined that he could do a better job than his attorney but acknowledged that he had no legal training and that the people available to help him in the prison law library were not lawyers. Defendant stated that defense counsel was rushing the case. The court, noting the case had been "well over a year on the call," responded that there was "nothing rushed about this case."

¶ 9     Defense counsel volunteered that defendant had provided him witness information, that he sent an investigator from his office to investigate the witnesses that defendant had identified, and that he had chosen as a strategy not to use them. Defense counsel further stated that he had discussed that decision with defendant. Specifically, he "broke it down into individual witness's folders for each witness, [and] went over that with the defendant in the lockup" on multiple court dates.

¶ 10    Defendant stated he wished to proceed *pro se*, and a lengthy exchange between defendant and the trial court ensued. During the exchange, the trial court stated that it did not "ring true" that additional investigation was needed and that, although defendant opined that he could "do better" than defense counsel, the relevant inquiry was whether he had the requisite capacity to make an intelligent knowing waiver of his right to counsel. Defendant interrupted the court several times, used profanity, accused the court of rushing the case, and repeatedly stated he was not going to trial. The trial court observed that defendant was "having a hard time just containing [him]self" and commented on the "level of agitation" he was demonstrating. The court denied defendant's request for self-representation and set the case for June 23, 2015, for status.

¶ 11    On June 23, 2015, defendant apologized to the trial court for his conduct at the preceding court date. He also stated that he was not "tryin' to go to trial," that defense counsel was "supposed to be" negotiating with the State regarding a guilty plea, and that he wanted "a long continuance."

¶ 12    After two more continuances, the case was called on November 24, 2015. On that date, defendant pled guilty to one count of first degree murder and one count of attempted first degree murder in exchange for consecutive sentences of 38 and 8 years in prison, respectively. In response to admonishments by the trial court, defendant indicated he understood the nature of the charges, the possible penalties, and the rights he was giving up by pleading guilty. He told the court, "I'm ready to get up out of here, go do my time."

¶ 13    The parties stipulated to the following factual basis for the plea:

> "If the State proceeded to trial, we would call the following witnesses, Jessica Payne, Joslyn Payne, Janice Payne, Charles Jackson, Danny Darling, and Anthony Brown. You would hear that the incident occurred February 28th, 2014.
>
> You would hear that the defendant, Frank Smith, and Jessica Payne had a dating relationship as of February 28th of 2014. After an argument the defendant and Jessica broke up. Jessica returned the ring to the defendant. The defendant was angry, got into an argument with Jessica.
>
> During this argument the defendant used a dangerous weapon to inflict injuries on Jessica's mother, Theresa Spearman. These injuries inflicted on Theresa Spearman by the defendant caused her death. Also, during this argument defendant used the same dangerous weapon to inflict injuries on Jessica Payne.

The defendant then fled and was later arrested. The defendant was positively identified by these witnesses as the offender."

¶ 14    The trial court found that defendant's plea was given knowingly and voluntarily and that a factual basis existed for the plea. The court accepted the plea, found defendant guilty of one count of first degree murder and one count of attempted first degree murder, entered judgment on the findings, and imposed the negotiated sentences. The court also advised defendant regarding his right to appeal and how to perfect it, which defendant indicated he understood.

¶ 15    Approximately 11 months later, in October 2016, defendant filed a *pro se* motion to withdraw his guilty plea and vacate sentence. Defendant contended his trial counsel was ineffective for (1) failing to properly set up a defense strategy, (2) misleading him regarding the plea agreement by telling him he had no chance of winning his case, (3) failing to "properly talk to witness[es]" who would have testified on his behalf, and (4) misusing the evidence. Defendant further argued that he was forced to plead guilty due to counsel's ineffectiveness.

¶ 16    On November 3, 2016, the trial court struck defendant's motion to withdraw his plea as untimely and removed the case from its call. Defendant thereafter filed an amended *pro se* motion to withdraw his guilty plea and vacate sentence, which the trial court denied as untimely on November 15, 2016. On appeal, we granted counsel's motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and dismissed the appeal. *People v. Smith*, No. 1-16-3410 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)(1)). In doing so, we found that the trial court lacked jurisdiction to consider defendant's motions to withdraw his plea and that, while we had jurisdiction to review the trial court's jurisdiction, we were without jurisdiction to review the merits of defendant's appeal. *Id.*

¶ 17 On May 15, 2018, defendant filed the *pro se* postconviction petition at issue in the instant case, alleging that (1) his trial counsel was ineffective where his advice to plead guilty stemmed from an inadequate investigation of potential witnesses; and (2) the trial court denied his request to proceed *pro se* in violation of his sixth amendment rights.

¶ 18 In support of his first allegation, defendant asserted that, just before the "altercation" at issue took place at a boarding house, Theresa Spearman, Jessica Payne, Joselyn Payne, Anthony Brown, Charles Jackson, Danny Darling, and a person known as "Big T" were in the kitchen, while defendant was in the living room with Otha Eagle, Corey Rogers, a person known as "Mookie," a person known as "Lil Nook," and an unknown person. Theresa Spearman entered the living room and initiated a confrontation with Lil Nook, during which she yelled at him, pointed her finger in his face, and pushed his head backwards.

¶ 19 Defendant intervened, instructing Spearman to go back to the kitchen. Spearman refused, pointed her finger in defendant's face, and pushed his head. Defendant grabbed Spearman's hand and told her to stop hitting him. Spearman punched defendant in the face, defendant pushed Spearman away, and Jessica Payne, Joselyn Payne, Brown, Jackson, and Darling "began attacking defendant." Defendant "pulled the firearm he was carrying and began hitting each of his attackers with the gun, but never fired a shot." Eagle, Rogers, and "Mookie" intervened and broke up the altercation, after which defendant retreated to a bedroom.

¶ 20 Spearman entered the bedroom and hit defendant in the head with a bottle. Defendant "jumped up to defend himself" but was attacked by Spearman, Jessica Payne, Joselyn Payne, Brown, and Jackson, who were variously armed with a bat, a broken bottle, and an "object of some

sort." Defendant "pulled his weapon and began firing to defend himself." Spearman was shot and killed, while Jessica Payne was shot but survived.

¶ 21    Defendant asserted that after he recounted these events to counsel, counsel informed the State that defendant would be claiming self-defense. Counsel sent an investigator to speak with Eagle and Rogers, but the investigator "was told that they were reluctant to testify, for fear of being charged as accomplices." According to defendant, counsel did not assure Eagle and Rogers that they would not be charged as accomplices. Instead, counsel informed defendant that they would not testify, stated that his defense would not be successful without their testimony, and advised defendant to plead guilty.

¶ 22    Defendant argued that "counsel's failure to inform the potential witnesses that they could not be charged as accomplices constituted ineffective assistance of counsel" and that counsel's deficient performance rendered his advice to defendant to plead guilty objectively unreasonable. Defendant asserted that counsel could have pursued the viable defenses of self-defense, imperfect self-defense, or mutual combat, and that counsel's decision not to do so was "based solely on his failure to inform the witnesses that they could not be charged as accomplices." He maintained that Eagle and Rogers would have testified that he only drew his weapon in response to Spearman's assault and that he twice had to defend himself against being assaulted by Spearman, Jessica Payne, Joselyn Payne, Brown, and Jackson.

¶ 23    Defendant further asserted that "the only thing derailing defendant's defense was the reluctance of Eagle, Rogers, and 'Mookie' to testify," and that "counsel could have easily curtailed these fears by simply informing them that they could not be charged given that they had not been implicated by State witnesses as being participants in the crime." Defendant argued that counsel

chose to advise defendant to plead guilty rather than secure the testimony of Eagle, Rogers, and "Mookie," as was his duty.

¶ 24    Second, defendant claimed that the trial court violated his sixth amendment rights by denying his request to proceed *pro se*. He argued that he "clearly set forth his desire to proceed *pro se* on the record," and quoted extensively from the record of proceedings on May 27, 2015. He argued that there was "no indication" that the trial court considered factors such as his age, level of education, mental capacity, and prior involvement in legal proceedings in denying his request. Instead, the court "rested its ultimate decision on defendant's level of 'agitation' in open court." Defendant argued that his agitation could be easily explained by his frustration with the court's treatment of his request and "what he perceived as the court forcing him to accept representation when he was clearly prepared to proceed *pro se*." He additionally argued that his agitation was not a sufficient reason to conclude that he lacked the capacity to knowingly waive his right to counsel. Defendant concluded that where his request to proceed *pro se* was unequivocal, unambiguous, well-articulated, and unmistakable, it should have been granted.

¶ 25    In support of his petition, defendant attached the transcript of proceedings from May 27, 2015, the date of his lengthy exchange with the trial court regarding his wish to represent himself. He also attached his own affidavit, attesting that he informed his trial counsel that several witnesses, including Eagle and Rogers, could contradict the State's version of events and testify that he had acted in self-defense. Specifically, he averred that Eagle and Rogers would testify that Spearman initiated the altercation by pointing her finger in his face and then shoving his face with that same finger; that defendant instructed Spearman to stop but she began striking him in the face; that he grabbed Spearman's hands in an attempt to stop her; that Jessica Payne, Joselyn Payne,

Brown, and Jackson came from the kitchen and began attacking him; that he drew his gun to defend himself but did not fire any shots; that he withdrew to the bedroom; that Spearman entered the bedroom and attacked him with a bottle; that Jessica Payne, Joselyn Payne, Brown, and Jackson joined in the attack, armed with a bat, stick, and a broken bottle; and that "it was only at this time" that he fired his weapon.

¶ 26    Defendant further averred that counsel sent an investigator to speak with "each potential witness," who reported to the investigator that they were unwilling to testify for fear that they would be charged as accomplices to the shooting. Defendant attested that counsel never attempted to assure the witnesses that they could not be charged as accomplices and abandoned any attempt to use "either witness." According to defendant, "this" led to a conflict between him and counsel and, as a result, he decided to proceed *pro se* and requested that he be allowed to do so.

¶ 27    Defendant averred, "The attorney subsequently convinced me to plead guilty. I felt like I had no choice given that I could not represent myself and counsel wouldn't call my witnesses." He stated that "each witness would still testify to the information contained herein." Finally, he attested that if counsel had assured Eagle and Rogers that they could not be charged as accomplices and if the court had allowed him to proceed *pro se*, he would not have pleaded guilty, would have proceeded to trial under a theory of self-defense, and would have requested a second degree murder instruction.

¶ 28    On August 9, 2018, the circuit court summarily dismissed defendant's petition as frivolous and patently without merit in a written order. Defendant filed a timely notice of appeal.

¶ 29                                    II. ANALYSIS

¶ 30    The Act provides a mechanism by which defendants may assert that their convictions were the result of a substantial denial of their constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act provides a three-stage process for adjudication. 725 ILCS 5/122-1 (West 2018); *Hodges*, 234 Ill. 2d at 9. The instant case involves the first stage of the process, during which the trial court independently assesses the petition, taking the allegations as true and giving the petition a liberal construction. *Hodges*, 234 Ill. 2d at 10, 21. Based on this review, the trial court must determine whether the petition "is frivolous or is patently without merit," and, if it so finds, dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2018).

¶ 31    A petition may be dismissed as frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition has no arguable basis in law when it is founded in "an indisputably meritless legal theory," for example, a legal theory that is completely belied by the record. *Id.* A petition has no arguable basis in fact when it is based on a "fanciful factual allegation," which includes allegations that are "fantastic or delusional" or contradicted by the record. *Id.* at 16-17; *People v. Morris*, 236 Ill. 2d 345, 354 (2010). Our review of a first-stage dismissal is *de novo*. *Hodges*, 234 Ill. 2d at 9. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 32    On appeal, defendant contends that summary dismissal of his petition was erroneous where (1) the trial court violated his sixth amendment right to self-representation when it denied his request to represent himself at trial; and (2) his trial counsel was ineffective for failing to subpoena key witnesses who would have proved his actions were justified.

¶ 33    As an initial matter, we agree with the State's contention that the summary dismissal of defendant's petition should be affirmed because his claims are waived by his voluntary guilty plea. " 'It is well established that a voluntary guilty plea waives all non-jurisdictional errors or irregularities, including constitutional ones.' " *People v. Sophanavong*, 2020 IL 124337, ¶ 33 (quoting *People v. Townsell*, 209 Ill. 2d 543, 545 (2004)). Our supreme court has explained that this waiver rule operates, even in the postconviction context, because plea agreements are contracts, to which principles of waiver apply. *People v. Jones*, 2021 IL 126432, ¶ 21. By pleading guilty, a defendant gains a present benefit in return for the risk that he might have to forgo future favorable developments in the law. *Id.* "[I]t would be fundamentally unfair to permit defendants to unilaterally modify their sides of the plea bargains while simultaneously holding the State to its side of the bargain." *People v. Lumzy*, 191 Ill. 2d 182, 187 (2000).

¶ 34    Here, defendant pled guilty. He did not file a timely motion to withdraw his plea, and he has not alleged any jurisdictional error or any error that occurred subsequent to the plea. In his reply brief, defendant acknowledges that a guilty plea "waives any claims of constitutional errors" but argues that, in his case, we should apply an exception to the guilty plea waiver rule that our supreme court, in *People v. Reed*, 2020 IL 124940, carved out for postconviction claims of actual innocence.

¶ 35    The constitutional claims defendant has raised in this case are (1) that the trial court violated his sixth amendment right to self-representation when it denied his request to represent himself at trial; and (2) that his trial counsel was ineffective for failing to subpoena key witnesses who would have proved his actions were justified. The first of these claims does not touch upon actual innocence. As such, we honor its waiver. Defendant argues that the second claim, although

presented as a claim of ineffectiveness of trial counsel, "demonstrates an arguable claim of actual innocence," as it "asserts *** a claim of self-defense that could result in an acquittal if found reasonable by a trier of fact." We disagree.

¶ 36    In *Reed*, our supreme court held that defendants who plead guilty may nevertheless assert an actual innocence claim under the Act. *Id.* ¶ 41. The *Reed* court reasoned that "our constitution affords additional due process when newly discovered evidence shows that a convicted person is actually innocent on the basis that '[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws.' " *Id.* ¶ 29 (quoting Ill. Const. 1970, art. I, § 2). The *Reed* court observed that a claim of actual innocence is separate and independent from a challenge to the sufficiency of the evidence or a claim that there was an error in the proceedings that led to a defendant's conviction. *Id.* ¶¶ 29, 31. Thus, a "defendant's waiver of his right to challenge the State's proof of guilt beyond a reasonable doubt at trial should not impact his actual innocence claim." *Id.* ¶ 31.

¶ 37    We reject defendant's position that the exception identified in *Reed* should apply here. This is because defendant has not made an actual innocence claim as contemplated by *Reed*. In *Reed*, our supreme court set forth the following standard for actual innocence claims raised by defendants who plead guilty:

> "[A] successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal. New means the evidence was discovered after the court accepted the plea and could not have been discovered earlier through the exercise of due diligence. [Citation.] This is a comprehensive approach where the court

must determine whether the new evidence places the evidence presented in the underlying proceedings in a different light and 'undercuts the court's confidence in the factual correctness' of the conviction. [Citation.]

This higher standard strikes an equitable balance between the defendant's constitutional liberty interest in remaining free of undeserved punishment and the State's interest in maintaining the finality and certainty of plea agreements, while vindicating the purpose of the criminal justice system to punish only the guilty. Because the evidence must be clear and convincing, the standard inherently requires the court to consider the evidence to be reliable. We therefore see no reason to further limit defendants who plead guilty by requiring them to support their petition with forensic evidence." *Id.* ¶¶ 49-50.

¶ 38 Defendant's claim does not come near to meeting the requirements for a claim of actual innocence as set forth in *Reed*. Though defendant argued in his petition that Eagle, Rogers, and "Mookie" would have provided testimony showing he acted in self-defense, this evidence was not "new." Defendant knew of the existence of these potential witnesses since the time of the incident. He gave their names to counsel, who investigated them and chose, as a matter of strategy, not to use them as witnesses. The evidence was not "discovered after the court accepted the plea" and it was not the case that it "could not have been discovered earlier through the exercise of due diligence." *Id.* ¶ 49. As such, defendant has not presented a postconviction claim of actual innocence as defined by *Reed* so as to avoid waiver.

¶ 39 Moreover, defendant failed to present affidavits of any potential witnesses. Pursuant to section 122-2 of the Act, a defendant is required to attach to his petition "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS

5/122-2 (West 2018). The purpose of this requirement is for the defendant to show that the allegations in his postconviction petition are capable of objective or independent corroboration. *People v. Allen*, 2015 IL 113135, ¶ 26. Here, defendant did not attach affidavits from any of his alleged eyewitnesses averring that they were willing to testify that defendant acted in self-defense, and he did not explain the absence of any such affidavits. He failed to provide any evidence to show that his allegations are capable of objective or independent corroboration. Consequently, there is nothing in the record to support his assertion that Rogers, Eagle, or "Mookie," if called to testify, would have provided information or testimony favorable to his defense. There is no proof that any such information exists.

¶ 40    We find that defendant's contentions on appeal are waived by his guilty plea, and the exception to waiver set forth in *Reed*, 2020 IL 124940, for postconviction claims of actual innocence does not apply. Therefore, the circuit court did not err in summarily dismissing his petition.

¶ 41                        III. CONCLUSION

¶ 42    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 43    Affirmed.